Mr. Morris. Good morning, your honors. Deputy Attorney General George Morris for the appellants uh Warden, excuse me, Hollands and Gutierrez. I'd like to save uh three minutes for rebuttal and I'll watch the clock. Enrico v. Ducart, this court made clear that supervisory defendants who oversee the federal court-ordered guard one suicide prevention checks in prison are entitled to qualified immunity because, quoting Enrico, no reasonable official would believe that creating additional noise while carrying out mandatory suicide checks for prisoner safety would violate an inmate's constitutional rights. Indeed, this court held that supervisory officials in particular would, again quote, have no reason to believe that carrying out the Coleman court's orders would cause the floor officers to inflict the constitutional injury. So, I agree with your, I mean we've got Enrico, I mean there's two things. One is, does Enrico control in the sense that, look, we have to grant qualified immunity here because Enrico compels it. That's a closer issue, but even if it didn't, why do you win? I mean, doesn't the other side, don't the plaintiffs, the plaintiff here, doesn't he have to show that there's clearly established law, even apart from Enrico, what is that clearly established law we're relying on? Well, I actually couldn't have better myself, your honor. So, first of all, I agree that Enrico controls in this case. There is no reason to distinguish Enrico in the sense that the same allegations about the same officer's conduct and the same allegations about the supervisor's conduct. Well, let me, okay, so let's take a step back because you sort of walked back into Enrico. Let me tell you my concerns with just saying Enrico controls. I mean, maybe it does, maybe it doesn't, but they do claim here, and I don't think this was an issue in Enrico, that there were certain guards who were saying, you know, please go file a complaint. We hate doing this. And there's some suggestion that they were trying to be a little bit, you know, either loud or obstructive so that they could kind of get this highlighted about how, in the guard's view, apparently, how ridiculous, you know, the court order was. And, you know, it's almost like a collusion between the guard, this odd collusion between the guards and the inmates to get this court order, you know, vacated in some way. And if that's happening, why wouldn't that put this outside of the Enrico context? Well, your honor, I'll take that in two parts. One is that, while there are allegations that some unnamed officers did this type of behavior. Does it matter that they were unnamed? This was on summary judgment? Yeah. Okay. And there are no guards. And there's no evidence. There's no evidence that any officer actually said that. That's correct. And probably most importantly here, there is absolutely no evidence that the flaw in plaintiff's argument really is, is that there is no evidence whatsoever on summary judgment that the wardens had any knowledge of any of these alleged statements by these unnamed guards. And so when you take that piece out, you do fall back into Enrico. But to follow up on your honor's other point, yes, I agree that even if Enrico didn't apply, which again is our position that it is on all fours here, the district court still had to do its own qualified immunity analysis. And it simply just not, did not do that here. And that is reason alone to reverse and remand because all the district court did was say, Enrico doesn't apply. And then relied on the general law that sleep deprivation could be a constitutional violation. And then said, there's a dispute of fact and we'll be done with that. Not once did they grapple with the second prong inquiry about identifying a case that would have put every reasonable officer and official on notice that the creation of noise, even excess noise during these guard one court mandated checks would violate the law. You just don't see any case law, let alone a robust consensus of case law from either the district court or from Mr. and his answer. Let me just, if there's a factual dispute and I want to hear what you have to say to this, but if there's a factual dispute about how loud the guards were being when they were tapping on that, isn't that what had to happen every 30 minutes they had to tap on the, on the, on the, on the, the door. If there was a factual dispute about how loud they were being and whether that was causing sleep deprivation, we wouldn't have jurisdiction to address that issue, right? If there was a factual dispute about that. Well, we would say that since we're here on the second prong here, we, there doesn't need to be, it doesn't matter if there's a factual dispute because whether or not it was this loud or that loud, the question is, is the law clearly established that making excess noise. But it seems that the law is clearly established that, that, that sleep deprivation, at least at this level, the law is clearly established. Sleep deprivation is, is a, is a, is a constitutional violation. Well, that is something that the RICO court directly addressed and said, while there is the law out there that sleep deprivation can be an eighth amendment violation, that doesn't end the analysis there. We've got to look at the specific context of the case. And the ninth circuit here said, existing case law does not shed light on the actual specific question here, which is, does the excess noise caused by the guard one checks, the court ordered mandated guard one checks would deprive. Your point is, even if they had evidence that the officers were bringing in some steel wand that was intended to create loud, you know, and obnoxious noises, even if they were doing it every 10 minutes and intentionally trying to keep them sleep deprived, you would still be entitled to qualified immunity because we don't have a case that says, you know, maybe there was sleep deprivation, but we don't have a case that says that way of causing sleep deprivation is an eighth amendment violation. Well, you know, I, again, I would say that the situation that you presented to me is a hypothetical and that's not the case here, right? Well, I know, but I want to know how, I want to know how far your argument goes, because I mean, I think what I'm going to hear from the other side when they stand up is, you know, this wasn't just enforcing that you could have enforced, you could have enforced the court order either in a way that caused sleep deprivation or that didn't, and the guards were doing it in a way that caused sleep deprivation. So I want to know how far you think that goes to what we can consider for purposes of qualified immunity. Well, I think that the best I can tell you is, again, looking back at RICO and what the allegations were in RICO, which they said, even if the guards were intentionally banging too loud on the metal discs, and even if they did it more frequently than they were supposed to, and made even more noise than they were supposed to, running up and down the stairs to make the check, even if you assume all of that as true, then the law still was not clearly established that that behavior violated the Constitution. So I think we are absolutely in that world. So how do we get it? What if they carried a boom box with, you know, turned up to volume 10 with them when they did it? Would you say you're still entitled to qualified immunity because we don't have a case that says you can't do that? Well, I think, again, we're talking about our two defendants here are the wardens. I understand. I understand. I'm trying to test. I understand those are not the facts here. I'm just trying to test how far out this goes because you're right. RICO cut a pretty wide swath on, you know, how much they could deviate from it. But I'm wondering where the limit is. Yeah. You know, there could be scenarios, Your Honor, where, you know, there is facts. That's the most important part, though, right? There are facts that establish that somebody ran around with a boom box and then we'd still have to, because the wardens are the defendants here, then we'd still have to have facts that the wardens knew about that and then didn't do anything. So there are scenarios, I think, where this could fall outside of RICO. But this is definitely not the scenario here. I think that it is clear that the facts here just align directly with RICO. And again, what you said is I do assume that my friends on the other side are going to come and say, well, he did complain about the intentional banging and the guards had some sort of plan to, you know, get the inmates to come to plain and whatnot. But again, even if you accepted that as true, that some unnamed guards might have said this, even though there is no evidence of it, even accepting that as true, there are no facts and they cannot point to any that the wardens had knowledge of this. And for supervisor liability, that's, you know, that has to be the case, that there's knowledge. And there just is no knowledge here. Counsel, given the power imbalance between the inmates, the guards and the wardens, who's going to step forward and say, oh, the warden knew about this, knowing that if the court disagrees or doesn't accept that fact, there might be reprisals later? Well, Your Honor, the knowledge piece, though, still has to be, it's the plaintiff's burden here. And what we have as facts is that when these grievances were submitted and there was an inquiry that was made and said, are these guards banging too hard? And what came back was, no, they're performing the checks as policy. And that went all the way up the chain, all the way to the third level of appeal. And all the evidence is that the wardens were aware that there was complaints about this new Guard One program that was inherently loud, but that there is no evidence whatsoever of any knowledge of intentional conduct. And actually, it's just to the contrary, that the only thing the wardens knew was an inquiry was made and the reports back were, they're doing it right. I have about four minutes, but unless there's other questions, I'll save that for rebuttal. Okay. Thank you. Good morning, Your Honors, and may it please the court. My name is Max Cohn. I'm a certified law student and I represent Joaquin Murillo. I plan to take eight minutes to discuss why the district court correctly distinguished RICO. And my co-counsel, Kiara Rivers, will spend the remaining time discussing why without RICO, defendants violated clearly established law. Your Honors, I want to start by addressing a few things my friend on the other side discussed, namely the issue of wardens' knowledge. There's two separate reasons that there's sufficient evidence in this record that the wardens knew about the intentional conduct that was being alleged. The first is that my friend on the other side says that the fatal flaw in this case is a lack of evidence at the summary judgment stage, but the government can't challenge evidence sufficiency issues on an interlocutory appeal of a denial of summary judgment. But there has to be some evidence. I mean, I agree with you. So what is the evidence? Absolutely. And so what the district court did correctly was that it inferred plausible inferences in Mr. Murillo's favor. And there's three key pieces of evidence that it relied on that would supply a reasonable jury with plenty of information to decide that the wardens did about this conduct. So the first thing is the quality and quantity of the inmate grievances. So this is all of the inmate grievances, not just Mr. Murillo's. We know that as many as 181 individual inmates filed grievances. We know that those grievances, many of them stated things like banging, things like staff retaliation due to their dislike of the system, and that guards were spitefully slamming on the cell doors. No part of Guard 1 ever should have included anything that resembles a banging sound. Guard 1 involves guards walking through the cells and carefully tapping. We have from Mr. Gutierrez describing how Guard 1 is supposed to look like. And so, okay, so this is helpful. I appreciate you going into the facts on this. Now explain to me why that gets you outside of RICO? Because I think RICO, I sort of suggest this, it does cut a pretty wide swath and sort of says, look, even if they are banging or making extra noise, that's not enough. So how do you address that question? I agree that RICO cuts a wide swath. That's why this case doesn't pose any danger of increased litigation in the future, because RICO sets a pretty low bar for officers. It's when there's allegations of mere carelessness, haphazard conduct. My friend on the other side said that in RICO, there were allegations of intentional banging from guards, but that's not the case. In RICO, the court is very clear that guards never acted worse than careless or haphazard. And that's from RICO's own allegations. He never said guards were intentionally banging. He referred to the unique design of Pelican Bay. And that brings me to the key point of RICO, which is it spends a lot of time discussing the design of Pelican Bay. That's because it had a lot of evidence about how Pelican Bay was designed. That's a little bit ironic because Pelican Bay was, I mean, RICO was decided at the motion to dismiss stage, but they had taken judicial notice of the special master report, which this court also has in the district docket, and we've supplied part of it in the request for judicial notice. And if you look at the special master report, which the RICO court clearly was looking at and citing heavily, it goes into extreme detail about what happened at Pelican Bay. Everyone knew that Pelican Bay posed a unique risk for guard one being allowed there. The shoe has the circular design. They make a loud sound for 12 seconds that would reverberate through every cell. And they knew all this because they conducted a noise study at Pelican Bay. And once they conducted the noise study and determined all these issues at Pelican Bay, they told guards to be quiet. They asked guards to put plastic wrap on the chains outside the cell doors. They told them to hold their keys while they walked. They took extensive ameliorative action because they were put on notice about still some risk of sleep deprivation. And the reason this case is so different is because we don't know that CCI, the prison in this case, was intentionally loud. In fact, it's your position that RICO is distinguishable because of Pelican Bay's unique design, basically. Well, it's three things. It's Pelican Bay's unique design and that we, I mean, if CCI, if we had in the record that CCI had these similar issues, then it doesn't have to only be Pelican Bay. It could be CCI. We just don't have any evidence about how CCI was constructed other than that it's made of concrete, metal, and steel. And then there's two other things that are key, which is the allegations of intentional conduct by the guards and that there's actually a lot more evidence here. The wardens were on notice about it based on all of the grievances that were filed. And there's one other piece of evidence that goes to the warden's notice that I want to highlight briefly, which is that, again, in the special master report, the special master was getting upset with CCI leading up to the implementation of Guard 1. It was noted that there was a problematic history of falsification of records at CCI of guards failing to actually conduct the suicide checks. And that just goes to the plausibility that they were upset they had to now do this electronic monitoring system that forced them to actually go every 30 minutes and do these checks. And the final thing that makes this case different than RICO is the actions that the wardens took in response to being on notice of the substantial risk of sleep deprivation. So in RICO, all the things I explained that they did once they knew there was a risk that inmates were being kept awake, here we have cursory statements that inquiries were made. And what the district court correctly did based off of those statements from the wardens here was say that there's no evidence a credible investigation was done. There's no evidence that the wardens actually looked into what the problem was. We don't know that they ever investigated things during first watch. So that's 10 p.m. to 6 a.m. when the bulk of the complaints were being derived from when people generally sleep. And those are the three distinguishing factors. And that's why this case isn't RICO. And one final thing, which is that Judge Mueller at the district court told the defendants this much when she denied their initial motion to dismiss post RICO. Judge Mueller denied several other Guard One related cases on the motion to dismiss stage. Those are referenced in the defendant's briefs. But this case was different clearly because Judge Mueller dismissed that motion to dismiss and denied it, sorry, and told them to add more to the record. Why is CCI like Pelican Bay? There's true differences here. And I'm going to yield the rest of my time to my co-counsel to discuss the clearly established law. Thank you. Good morning, Your Honors, and may it please the court. I guess we can give that extra time on the clock for, yeah, eight minutes would be great. Thanks. Good morning, Your Honors, and may it please the court. My name is Kiara Rivers. I'm a certified law student and I also represent the plaintiff here. It has been known since 1500 at least that deprivation of sleep is the most effective torture. The district court correctly denied qualified immunity to the defendant wardens. Now, I will touch on a couple elements here. So, counsel, I think you're right in the sense that sleep deprivation is. Qualified immunity is tough, clearly established. I mean, you drew the short end of the stick on the argument here, right? Because you've got the tougher case it seems to make, which is what is the case that says that sleep deprivation here? We heard a lot of factual dispute, you know, factual issues, but it's hard to imagine that there's a case that says, hey, your keys swinging too loudly is enough for sleep deprivation. You know, banging on the gate, you know, is enough for sleep deprivation. Where is your case that says that, that fits into this, that lets us say that this is clearly established? So, we look at four separate cases, but on sleep deprivation specifically, we look to Ashcraft v. Tennessee, which is a Supreme Court case from 1944. There, they're simply stating that sleep deprivation has been known as torture for centuries, but beyond that, the Ninth Circuit stated in Keenan v. Hall, to sustain an Eighth Amendment claim, the plaintiff must prove a denial of the minimal civilized measure of life's necessities via deliberate indifference by prison personnel or officers. So, we turn a lot to that deliberate indifference. Yeah, but you still have to have a case that says the facts here fit within deliberate, you know, deliberate indifference. What is that case that gives us something? I mean, look, the Ninth Circuit, we've gotten knocked down many times by the Supreme Court because we've kind of You're right. Sleep deprivation is there, but where's the case that says sleep deprivation in this context is clearly established? Well, Your Honor, we're relying on the intersection of four different rights, which the Ninth Circuit has established is an acceptable way to find that that law is clearly established. We're relying on sleep deprivation, excess noise, wanton infliction of harm, and deliberate indifference. So, I can take those in turn. Well, go to the, well, the harm, I didn't know that there was wanton infliction of harm. Just related to the sleep deprivation or is there something else? It is related to the sleep deprivation. It's the allegations of intentional banging. Okay. The, you know, their statement of just 602, just file an appeal, the retaliation aspect, things of that nature. So, where's the case that says intentional banging on the door in response to a court order is an Eighth Amendment violation? So, we don't have something directly on point about the court order element, but we find that the issue here is more complicated than that, that it's more, it's more to whether supervisor's failure to take any corrective action despite the notice of intentional and excessive sleep deprivation and noise violates clearly established law, but on the element of wanton infliction of harm. In 1986, the Supreme Court in Whitley v. Albers stated, unnecessary and wanton infliction of pain constitutes cruel and unusual punishment forbidden by the Eighth Amendment. So, here we see no legitimate penological purpose for the alleged banging noises made by guards. As Gutierrez stated, guard one did not require the amount of noise alleged, and you see that in his own declaration. A lack of legitimate penological purpose plus allegations by the plaintiff of guards acting in retaliation clearly supports an inference of intentional infliction of excessive noise and sleep deprivation. Now, beyond that, on excess noise in 1996, again in Keenan v. Hall, the Ninth Circuit stated, public conceptions of decency inherent in the Eighth Amendment require inmates be housed in an environment reasonably free of excess noise. Now, we want to be clear, plaintiff is not challenging the validity of the guard one system, but rather the intentional excessive unnecessary noise made through the abuse of the system and the failure to remedy it. We don't challenge that maintaining order in a prison sometimes requires noise, so the Eighth Amendment only requires the environment be free of excessive noise. Plaintiff defines the banging alleged here to be excessive noise that had no legitimate purpose, and we acknowledge that, you know, sleep deprivation... So, can you walk through the evidence with me? The only, I mean, there's not any decibel evidence. There's, right now, all we have, and I'm not saying it's not enough, but I just want to make sure I understand the contours of it, is evidence of the inmates saying this was excessive and it kept me awake. So, we have a couple things to the extent of noise. Obviously, the allegations of intentional repeated excessive banging in Mr. Murillo's grievance, despite Gutierrez saying you can't properly register the checks with that amount of noise, that allows an inference that if checks were being recorded properly at the time and were not showing errors, which we have no evidence they were showing errors because then correctional sergeants would address that, then guards must have been making additional noise on top of the welfare checks. But beyond that, we also see a use the quieter alternatives that were available to them. We see in defendant Gutierrez's declaration that during first watch, they were required by their own policy to use a muted version of the wand because the wand beeps. And we see in multiple complaints, in multiple grievances, that the beeping is happening. So, there's a failure to use these alternative options, again, pointing to intentionality. The numerous grievances, of course, there's at least 100 individuals, if not 181 by the district court's count. And, you know, we can even look to ECF-104 in the district court's record to get at more of that intentionality and retaliation. So, this all allows a reasonable inference of substantial noise. So, from there, on deliberate indifference, in Farmer v. Brennan, the Supreme Court stated a prison official can be found liable under the Eighth Amendment if the official knows of and disregards an excessive risk to inmate health or safety, meaning they must be aware of the facts from which the inference could be drawn that there's a substantial risk of serious harm. And they must show that officials had no reasonable jurisdiction for, excuse me, justification for the deprivation. So, the district court stated following Thomas v. Ponder that you can establish awareness if the risk posed by the deprivation is obvious. Now, the situation here violates four separate fundamental principles in the Eighth Amendment, you know, that wants an harm, sleep deprivation, excessive noise, and deliberate indifference. We argue that that makes it incredibly obvious. The district court stated because excessive sleep deprivation and excessive noise can amount to an Eighth Amendment violation, it follows that inmates experiencing those problems may face a serious risk of harm. And again, I mean, you can find that awareness in numerous complaints, multiple claims of intentionality. The substantial risk of serious harm just comes from sleep depriving anyone. Can I ask just, and I should have asked this up front, but this almost seems like an alternative, the arguments you're making now almost seem like an alternative basis to affirm the district court. Because the deficiency that I found in the district court order is it's all focused on RICO. And to me, that's not the right analysis. Like it might fit within RICO, it might not. But I didn't see, you're doing a better job than the district court did of walking through the cases. And I just want to get your response to that. Do you think the district court did this work or you're saying, no, this is an Well, we think the district court came to the right conclusion ultimately. But we do think that there was clearly established law that just wasn't addressed by the district court. That's correct. Okay. All right. May I briefly conclude? Yeah. The law was clearly established at the time that prison officials could not legally be deliberately indifferent to intentional and excessive noise and sleep deprivation as they were here. Therefore, we ask that you affirm the district court's denial of qualified immunity. Thank you very much. What law school are you affiliated with, please? UC Davis. We're a part of the Civil Rights Clinic. Very well. Thank you. Thank you. Excuse me. Just to address a few points. The first was that there's ample knowledge of, ample evidence of the warden's knowledge. That's just simply not true. I didn't hear any sight to the record. And there was no complaints that the wardens would have been aware of retaliation or this type of conduct that Mr. Murillo alleged. In terms of the structure of the SHU, I think that the district court's basis or the distinction there is both, I think, it's really not, it's out of import because that's not, that wasn't the reason why RICO held, how it held was because of the structure of the Pelican Bay SHU. But even if you want to talk about the structure of the Pelican Bay SHU versus CCI, there is evidence in the record of the structure of CCI. Mr. Murillo himself testified in his deposition that the sound, he could hear the sounds of the discs and 20 cells around him. He could hear the footsteps up and down. And he testified that even if guard one was done considerably and carefully, he would still be woken up every 30 minutes by the sounds of the pod door opening and closing. So you still have that same prison structure here that causes, you know, extra noise. Is your argument, because one of the arguments that they made was there were clearly less intrusive, quieter ways of enforcing the court order. And I guess the argument is, well, the warden didn't do enough investigation to look at those, but it seems to be your sort of making an argument that even if the wand were quieter, even if all these other things were quieter, you had some basic problems that were still going to raise to that level that couldn't have been corrected. That's correct. And I believe that's why Rico held the way it held. Right. It's it's you know, you could you could do this in the guard one in a prison. They're all made of metal, concrete and steel, and they're still going to be noise. And and the relevant question then is, is there case law out there that says that beyond debate, that the creation of noise and these guard one checks would clearly violate the inmates constitutional rights? And Rico said no. And Rico rejected all of the different cases that my friends on the other side just discussed. And that makes sense because those cases are just talk about the general sleep deprivation and they don't go to specifics, which Rico says you have to do. And so the relevant question here is, again, clearly established law with these specific facts about the the guard ones in the prison, not the general law. And it was really telling that I think you asked numerous times, can you give me the case? Can you tell me? And my friends on the other side couldn't do it. And the district court wasn't able to do it as well. Counsel, let me take you back to the notice you argued earlier. Counsel suggested that the quality and quantity of the inmate grievances should have put the wardens on notice. Did they not see these grievances? Well, the one warden did not. One of them, one warden did. But to the to the number of grievances, this was a new system that was in place. And so it's not surprising that there would be multiple grievances about an inherently noisy guard one system. And, you know, we talk about like the number. It's a little bit skewed because one of them is a group complaint that had 50 sign on and had the same allegations. But but that's still 130 unique complaints out of the other maybe 1500 that were in the shoe at that time. But the bottom line is that if it was one complaint or 100, that actually wouldn't inform the analysis or the question that we have to ask here, which is, was the law clearly established? And so whether, again, it's one inmate complaining or 100, that's not going to have any bearing on the on the question that we have to answer here, which was, was the law clearly established? It was not. RICO said no. The court's framing, reasoning and rationale and RICO apply here. And therefore, this court should reverse and remand with instruction to the district court for an order granting qualified immunity to wardens Holland and Gutierrez. Thank you. Thank you to all counsel for your arguments in the case. And obviously, we think, you know, professional counsel who's certified in the bar. But to get the kind of arguments we just got from law students, we've got some professors and instructors that are doing a good job. Keep it up. And we well, we look forward to welcoming lawyers of your quality into the bar. So thank you. The case is now submitted.
judges: SMITH, NELSON, Morris